**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ANTHONY STELLA,     :
            :
     Plaintiff,   :
            :
   v.       :  C. A. No. 17-1591-MPT
            :
STATE OF DELAWARE DEPARTMENT :
OF EDUCATION, et al.,    :
            :
     Defendants. :

## MEMORANDUM

## I. INTRODUCTION

On November 6, 2017, Anthony Stella ("Stella") filed this action against the State of Delaware Department of Education ("DOE"), Sandra Waldee-Warden ("Warden") and Susan Bunting ("Bunting")[1] alleging the following causes of action:  Retaliation in Violation of First Amendment (Count I); Breach of Contract (Count II); and Breach of the Implied Covenant of Good Faith and Fair Dealing (Count III).[2]

On February 5, 2018, Stella filed a First Amended Complaint ("FAC") adding additional defendants Delaware Department of Correction ("DOC"), Robert Coupe ("Coupe"), and Perry Phelps ("Phelps"), and a cause of action for Denial of Substantive Due Process under 14th Amendment State-Created Danger (Count IV).[3]  On July 24,

---

[1] Warden and Bunting are collectively referred to as "Individual Defendants" and, with the DOE, as "defendants."  Warden is the Teaching Supervisor at James T. Vaughn Correctional Center.  D.I. 18 ¶ 11.  Bunting is the Secretary of Education for the State of Delaware Department of Education.  *Id.* ¶ 12.
[2] D.I. 1.
[3] D.I. 18.  The FAC specifies Counts I-III are alleged against the DOE and the Individual Defendants, and Count IV is alleged against the DOC, Coupe, and Phelps.

2018, the court granted defendants' motion to dismiss Count IV.[4]

This action was brought following the DOE's termination of Stella's employment on April 4, 2017.[5]  He was terminated due to communications he made regarding a prison riot on February 1, 2017, allegedly in violation of DOE and DOC communication policies.[6]  Presently before the court is defendants' motion for summary judgement.[7]

For the reasons stated below, defendants' motion is granted in part and denied in part.[8]

## II.  BACKGROUND

The DOC's mission is to protect the public by supervising adult offenders and by directing them to treatment, education, and work programs.[9]  The purpose of the educational program is to provide education to offenders without a GED, high school diploma, or vocational training.[10]  Among the vocational skills taught are culinary skills.[11]

Most of the teachers in the prison system are hired and employed by the DOE, but work under a DOE/DOC partnership as detailed in a Memorandum of Understanding ("MOU").[12]  The MOU describes DOE's responsibilities, e.g., "ensur[ing]

---

[4] D.I. 36.
[5] D.I. 18 ¶ 16.
[6] *Id.* ¶¶ 41, 45.
[7] D.I. 67.  Defendants filed a single motion for summary judgment but separately briefed certain arguments.  Briefing by the Individual Defendants is found at D.I. 68, D.I. 71, and D.I. 75.  Briefing by the DOE is found at D.I. 69, D.I. 72, and D.I. 74.
[8] The parties consented to the jurisdiction of this magistrate judge for all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings.  D.I. 11.
[9] D.I. 70 (Appendix to Defendants' Opening Brief), A1 (Memorandum of Understanding) at A1.
[10] *Id.*, A1 at A1.
[11] D.I. 68 at 2.
[12] D.I. 70, A1.

that all educational staff comply with both DOE and DOC rules, regulations and institutional standard operating procedures (SOPs) regarding conduct in a security environment and report[ing] violations."[13]

Stella was hired by the DOE as a prison education teacher responsible for developing and implementing a culinary arts program for DOC inmates.[14] His employment was governed by an employment contract for a term from January 4, 2016 through June 30, 2016.[15] He entered a second employment contract with the DOE for a term from July 1, 2016 through June 30, 2017.[16] The two contracts are identical in relevant part. Each provided the DOE could terminate Stella's employment before its expiration date: (1) pursuant to the provisions of 14 *Del. C.* § 121(a)(5), which provides for dismissal for misconduct in office or willful neglect of duty,[17] (2) for any disciplinary action initiated by the DOE, or (3) for any violation of the DOC's policies and procedures, including its "Code of Conduct."[18]

From January to March 2016, Stella received DOE training to work in a Level 5 prison.[19] The topics covered related to working in prison education and review of the DOE Employee Handbook, DOE/DOC Collaboration (including "Chain of Command"), and DOE/DOC communications.[20] His signed acknowledgment affirmed he completed

---

[13] *Id.*, A1 at A4.
[14] D.I. 18 ¶ 17.
[15] D.I. 70, A36 (DOE Employment Contract (Feb. 5, 2016)).
[16] *Id.*, A41 (DOE Employment Contract (July 1, 2016)).
[17] *See* 14 *Del. C.* § 121(a)(5).
[18] D.I. 70, A41 at A43.
[19] *Id.*, A45 (Prison Education: DOE Initial Training) at A45.
[20] *Id.*, A45 at A45; *id.*, A81 (letter from Hammon to Stella (Mar. 15, 2017) ("pre-termination letter")) at A83.

this training, understood its relevance to his work plan, and would clarify any questions with his Teacher/Supervisor.[21]

From January 4, 2016 to March 14, 2016, Stella also received DOC Correctional Employee Initial Training ("CEIT") to prepare for working in a Level 5 prison.[22] CEIT covered topics including the DOC Code of Conduct and Press Policy.[23]

Section 1.4 of the DOC's Employee Code of Conduct states: "[s]taff shall be courteous while interacting with any person, discharge their duties in a fair, impartial manner, and recognize their responsibilities as public employees."[24] Section 1.5 lists examples of "unbecoming staff conduct," including: dissemination of confidential information contrary to DOC policy or procedures, any conduct that would interfere with the staff member's ability or fitness to effectively perform required duties, and violation of any DOC policies.[25]

DOC Policy Number 10.3, "Communications and Community Relations," states:

The Chief of Media Relations (CMR) will be the central contact for all news media and public inquiries. The CMR will address emergent, non-emergent and special event issues and will ensure:

---

[21] *Id.*, A45 at A45.

[22] *Id.*, A46 (DOE Record of Training CEIT Class 212) at A46.

[23] *Id.*, A46 at A46. By affidavit, Stella states his CEIT Record of Training form does not include "press policy" among the topics covered, and that he has "no specific recollection of any of the communications policies being specifically addressed or reviewed during [CEIT] training and graduation." D.I. 73 (Appendix to Plaintiff's Opening Brief), A072 (Stella Aff.) at A072 ¶¶ 3-4. In his pre-termination letter, Hammon stated "DOC policies/procedures for public communication" was among the topics covered during Stella's CEIT training. D.I. 70, A81 at A83. Stella signed a DOE Initial Training document listing "DOE/DOC Collaboration (CEIT Training, MOUs, Chain of Command)" and "DOE/DOC communications" as topics covered that he completed and understood. *Id.*, A45 at A45.

[24] D.I. 70, A8 (DOC Employee Code of Conduct) at A13 § 1.4.

[25] *Id.*, A8 at A14 § 1.5(i), (j), (p).

> A.  A mechanism for facilitating prompt, complete, and accurate responses to all reasonable inquires from the public and news media.
>
> B.  A program which encourages appropriate contact with the public and news media through the dissemination of news releases and informational materials.[26]

Section 8.11.2 of the DOE Employee Handbook, "Communication with Media," states:

> All media inquiries shall be directed to the Public Information Officer.  The PIO will manage all responses in coordination with the Secretary, Deputy Secretary or appropriate Associate Secretary.
>
> Staff may respond as necessary and appropriate when questioned by the media at public events and meetings.  All such communications must be factual and must represent Department policies and procedures.  All such communications must be reported immediately to the appropriate Director, Associate Secretary or Deputy Secretary and to the PIO.[27]

After graduation from CEIT, Stella was assigned to the James T. Vaughn Correctional Center ("JTVCC") and rotated every month to a different correctional institution.[28]  This rotation caused Stella to miss routine training exercises that reinforced DOC and DOE policies.[29]

On April 18, 2016, Warden sent Stella an e-mail containing the "communication policy we discussed" that stated "[a]ll official communications concerning the prison education program must first go through/be approved by the teacher supervisor.  This includes, email, phone calls, letters, and personal communications with DOC and DOE

---

[26] D.I. 73, A105 (DOC Policy No. 10.3).
[27] D.I. 70, A25 (DOE Employee Handbook (Feb. 5, 2016)) at A34-35 § 8.11.2.
[28] D.I. 18 ¶¶ 18, 20.  Stella worked for three months each at JTVCC, Sussex Correctional Institution, and Howard R. Young Correctional Institution.  *Id.* ¶ 20.
[29] D.I. 73, A072 at A073 ¶ 6.

administration and outside agencies."[30]

On October 19, 2016, Stella sent an e-mail to Michael Grossman, DOE Education Associate, Adult & Prison Education Resources, seeking information on a teaching certification process and stating "I'm trying hard to lean the whole 'chain of command' thing since I've spent my entire career in the private sector.  If I wrote to you in error please let me know."[31]

On November 18, 2016, Warden sent Grossman and DOE Teacher Supervisor Kristi King an e-mail stating "[i]f I did not print [the communication policy] for [Stella] I know I verbally informed him of this policy when he took it upon himself to contact [the individual] who oversees food services here, and when he was talking about contacting the Commissioner directly."[32]  Shortly thereafter, Grossman responded "we need to work through this and move forward, assuring he clearly understands for each site, in writing would help."[33]  King replied to Grossman and Warden that she spoke to Stella that morning about the need to follow the chain of command and that he received her instructions well and understood them.[34]

On January 3, 2017, Warden sent Stella an e-mail telling him to "remember DOC's chain of command," in response to his request to use a DOC locker for his personal items.[35]  Warden suggested the request should come through her, rather than

---

[30] D.I. 70, A49 (e-mail from Warden to Stella (Apr. 18, 2016, 1:57 p.m.)).
[31] *Id.*, A52-A53 (e-mail from Stella to Grossman (Oct. 19, 2016, 2:44 p.m.)).
[32] *Id.,* A50 (e-mail from Warden to Grossman, King (Nov. 18, 2016, 9:00 a.m.)).
[33] *Id.*, A50 (e-mail from Grossman to Warden, King (Nov. 18, 2016, 10:52 a.m.)).
[34] *Id.*, A50 (e-mail from King to Grossman, Warden (Nov. 18, 2016, 11:41 a.m.)).
[35] *Id.*, A53 (e-mail from Warden to Stella (Jan. 3, 2017, 11:37 a.m.)).

going directly to DOC personnel.[36]

On February 1, 2017, Stella was teaching at JTVCC during his normal rotation when Building C of the facility was subject to an inmate takeover.[37]  Stella was in the separate Education Building with twelve inmates preparing to finish his class when an audible Code One signaled an attack on a correctional officer.[38]  Despite confusion in the hallways, Stella closed his classroom door and continued teaching because he had not been instructed to leave.[39]  Shortly thereafter, the prison was placed on lock down and he was escorted from the classroom to a training room with other staff and correctional officers where he learned the prison was subject to an inmate takeover.[40]  There was internet access through computers in the training room and Stella contacted his wife to let her know he was in no immediate danger.[41]  Communications with the inmates, including threats to kill a hostage, were audible over correctional officers' radios which made Stella feel sick and he distanced himself from the radios.[42]  After about three hours, Stella and the others were moved to a visiting room, where they continued to hear inmate negotiations but were allowed to walk around more freely.[43]  After approximately five hours of confinement in the two rooms, they were released to leave JTVCC around 6:00 p.m. that evening.[44]  The hostage crisis ended shortly after

---

[36] *Id.*
[37] D.I. 18 ¶¶ 23, 24, 32.
[38] *Id.* ¶ 32.
[39] D.I. 73, A001 (Stella Dep. Tr. (Sept. 18, 2018)) at A017-A018, 65-66.
[40] *Id.*, A001 at A018, 66; D.I. 18 ¶¶ 27-28, 32.
[41] D.I. 73, A001 at A019-A020, 68-69; *id.*, A077 (Warden Dep. Tr. (Sept. 20, 2018)) at A086, 101.
[42] *Id.*, A001 at A021-A022, 70-71.
[43] *Id.*, A001 at A023-A024, 72-73.
[44] *Id.*, A001 at A019, 68, A023-A024, 72-73; D.I. 18 ¶ 24.

5:00 a.m. the next morning when a prison Response Team gained access to Building C.[45]

Stella immediately drove from JTVCC and pulled over and parked at his first opportunity.[46] There, he was overcome by emotions; his hands were shaking and he began to cry as he called his wife, who was in California at the time.[47] He regained composure after the call and resumed driving home when he received a call from a number he did not recognize.[48] The caller said, "Anthony, are you okay?" to which he responded, "Who is this?," and was told, "Esteban."[49] Stella then recognized the caller as a reporter he was acquainted with from the News Journal, Esteban Parra ("Parra").[50] He remembers the call, but nothing about the conversation or what occurred from the time he left the prison until arriving home.[51]

The News Journal published an article at 10:15 p.m. February 1, 2017 identifying Stella as a DOE employee and culinary instructor at JTVCC and reported his observations while in lock down at the prison.[52] At the time of the conversation, Stella was not aware an article recounting his experiences would be published and did not know what information was public.[53]

---

[45] *See* D.I. 70, A137 (Magee Dep. Tr. (Sept. 27, 2018)) at A139, 32; https://www.delawareonline.com/story/news/crime/2017/02/02/delaware-prison-hostage -employee-killed/97388146/.

[46] D.I. 73, A001 at A030, 84.

[47] *Id.*, A001 at A030-A031, 84-85.

[48] *Id.*, A001 at A031, 85.

[49] *Id.*, A001 at A032-A032, 85-86.

[50] *Id.*, A001 at A031, 85.

[51] *Id.*, A001 at A032-A033, 86-87.

[52] D.I. 70, A54 (News Journal article (Feb. 1, 2017)) at A54-A55.

[53] *Id.*, A100 (Stella Dep. Tr. (Sept. 18, 2018)) at A106, 89, A113-A114, 127-29.

After returning home that night, Stella could not sleep and called his wife who suggested he write down his experiences as a cathartic mechanism to deal with the stressful events of the day.[54]  Following that suggestion, he wrote out his thoughts and posted them on his Facebook page around 11:00 p.m.[55]  Stella testified he had developed positive relationships with some of his student-inmates and was bothered by what he perceived as the media's generalization of inmates as "bad."[56]  That over-generalization was part of the reason him wrote and published his thoughts on the incident on Facebook.[57]  He was unequivocal, however, that the only reason for his actions was as a coping mechanism.[58]  At the time he went to bed, Stella knew the riot was ongoing and had "no idea" when it would be resolved.[59]

Stella estimates he had around 800 friends on Facebook at the time of his post, including at least one reporter.[60]  His post praised DOC and DOE officials, as well as inmates he worked with:

I was also honored to spend close to three months in the correction officers' academy CEIT 212, and I have come to consider each and every correction officer a colleague and a friend.

The [DOE] and the [DOC] both care for the wellbeing of those that entrust us for their safety and rehabilitation.

The hard working people for the [DOC] do all that they can to be respectful, and of course there are exceptions, but these people are good people–people who work hard to provide for their families and who provide

---

[54] *Id.*, A100 at A107, 94.
[55] *Id.*, A100 at A107, 94-95, A109, 106; *id.*, A66 (complete Facebook post).
[56] *Id.*, A100 at A107, 94.
[57] D.I. 73, A001 at A038, 94.
[58] D.I. 70, A100 at A109, 106.
[59] *Id.*, A100 at A112, 121-122.
[60] *Id.*, A100 at A107, 96, A108, 103.

a great service to the community.

The people who work for the [DOE] also work tirelessly to help the inmate/students who desire to have a better life.

Don't believe for a minute that we mistreat prisoners.

I also know that the good people at DOC and the inmates who I have had the pleasure to know will protect me.[61]

The post also expressed negative descriptions of other inmates:

The inmates who sieged Building C and put our colleagues in great peril today are not the inmates that we teach. These inmates claim that they are fighting for their rights–they claim they want education–they claim they want to be treated fairly. To that I say bullshit! The inmates from Building C are among the worst off the worst. They wear yellow jump suits and they are not permitted to walk freely as are the inmates who wear white–the same ones who I teach.

And they wonder why they are treated this way. Well don't for a minute believe their cries for help and in justice. These are men who have not decency–men who think nothing of taking a life–men who think only of themselves. These men should not receive any rights as they are always ready to take someone else's right away from them.[62]

Timothy Magee ("Magee"), a fellow prison educator and Facebook friend, saw Stella's post around 6:00 a.m. February 2, 2017 and was "shocked" by its negative description of some inmates.[63] Not knowing if the prison takeover was ongoing, and believing the post potentially put hostages in more danger if read by or quoted to the inmates, Magee texted Stella advising him to take the post down.[64] After approximately

--------

[61] *Id.*, A66 at A66-A67.

[62] *Id.*, A66 at A66.

[63] *Id.*, A137 at A139, 32-33, A143, 52; *id.*, A94 (letter from Magee to Hammon (July 18, 2017)).

[64] *Id.*, A137 at A139, 32-33, A143, 52-53. Magee testified it was not until around 7:00 a.m February 2 that he first saw news reporting the hostage situation concluded. *Id.*, A137 at A139, 32.

twenty to thirty minutes of back-and-forth texting, Stella did so.[65]  In the interim, Magee

took screen shots of the inflammatory portions of Stella's Facebook post and texted

them to Warden because, at that point, Stella had not taken the post down.[66]  After

receiving Magee's screen shots, Warden contacted Stella and instructed him to remove

the post, to which he responded he had done so.[67]  Warden also sent the screen shots

to her supervisor, Maureen Whelan ("Whelan"), State Director for Adult and Prison

Education Resources.[68]

Stella testified he submitted the Facebook post as an editorial via the online

portal on delawareonline.com sometime prior to 10:39 p.m. on February 1, 2017.[69]

Within minutes, Stella communicated with Parra about the submission which he

attached to his e-mail.[70]  Parra immediately responded that he would "see about

attaching this to the story so people can read it."[71]  After his exchange with Magee the

following morning, Stella was "frantic" and attempted to reach Parra to implore him to

prevent publication of his letter to the editor and relay that he was "not allow[ed] to

comment."[72]  Parra immediately responded, "I'll let them know.  Did you send it to the

---

[65] *Id.*, A137 at A143a, 54.

[66] *Id.*, A137 at A143a, 55-57; *id.*, A62 (e-mail from Warden to Hammon attaching Magee's screen shots (Feb. 3, 2017, 5:59 a.m.)) at A62-A65.

[67] *Id.*, A125 (Warden Dep. Tr. (Sept. 20, 2018)) at A126, 62-63.

[68] *Id.*, A62 at A62-A65; *id.*, A128 (Whelan Dep. Tr. (Sept. 25, 2018)) at A129, 9.

[69] *Id.*, A116 (Stella Dep. Tr. (Oct. 18, 2018)) at A116a, 196; *id.*, A61 (automatically-generated e-mail from Delaware Online to Stella (Feb. 1, 2017, 10:39 p.m.)).

[70] *Id.*, A56 (email chain between Stella and Parra "re:  Anthony Stella" (Feb. 1-2, 2017) at A58 (e-mail from Stella to Parra (Feb. 1, 2017, 10:47 p.m.)).

[71] *Id.*, A56 at A57-A58 (e-mail from Parra to Stella (Feb. 1, 2017, 10:50 p.m.)).

[72] *Id.*, A116 at A117a, 213; *id.*, A56 at A57 (e-mail from Stella to Parra (Feb. 2, 2017, 7:21 a.m.)).  Stella testified "I think I tried to call, and I probably left [Parra] a hundred voicemail messages because I wanted to make sure that didn't get in there."

opinion page, as well?"[73]  Stella replied, "Yes[.]  I will be in deep trouble if its published[.]  Thank you[.]"[74]  It appears Stella's editorial (identical to his Facebook post) was never published, although he could not recall if or how he confirmed this.[75]

For several weeks following the hostage crisis, teachers in prison education were not permitted to return to JTVCC as the facility was still in emergency operations.[76]  On February 10, 2017, Whelan contacted Christopher Klein ("Klein"), then DOC Bureau Chief of Prisons, advising that the DOE intended to interview Stella regarding a violation of the DOE's communication policies, and asking if the DOC had concerns about Stella's re-entry to the prison and whether it wished to be involved in the interview.[77]  Klein responded that the "DOC does have significant concern based on the information," but declined to participate in the investigation due to time and resource limitations.[78]  He suggested the DOE follow its internal processes for handling the matter, but emphasized Stella should understand the DOC reserved the right to revoke his security clearance regardless of any action the DOE might take.[79]

On February 20, 2017, DOE Human Resource Officer Jeanette Hammon ("Hammon") notified Stella by letter that the DOE had initiated an investigation of his

*Id.*, A116 at A117, 210.

[73] *Id.*, A56 at A57 (e-mail from Parra to Stella (Feb. 2, 2017, 7:23 a.m.)).

[74] *Id.*, A56 at A56 (e-mail from Stella to Parra (Feb. 2, 2017, 7:32 a.m.)).

[75] *Id.*, A116 at A117a, 213-14.

[76] *Id.*, A156 (Klein Decl.) at A159-A160 ("[I]n February and March of 2017 JTVCC remained in emergency operations while the riot and the murder of a correction officer were being investigated."); *id.*, A144 (Klein Dep. Tr. (Oct. 9, 2018)) at A145, 49.

[77] *Id.*, A71 (e-mail chain among Harmon, Klein, Whelan (Feb. 10-23, 2017)) at A72 (e-mail from Whelan to Klein (Feb. 10, 2017, 2:20 p.m.)).

[78] *Id.*, A71 at A71-A72 (e-mail from Klein to Whelan (Feb. 14, 2017, 2:48 p.m.)).

[79] *Id.*, A71 at A71-A72.

actions on February 1, 2017, stating that he was prohibited from entering any DOC facility during its pendency and that he would be notified of the investigation's final outcome.[80]  Hammon conducted the investigation, which included interviewing Stella, with Grossman and Warden present, to determine if Stella spoke to the media and whether the Facebook post was his.[81]  Hammon also spoke to Warden and King, and collected relevant documents including:  screen shots of the Facebook post, the News Journal article, applicable DOE and DOC policies, the MOU, and letters written by Stella or submitted on his behalf; all of which she provided to Bunting.[82]  Following her investigation and consultation with DOE legal counsel, the decision was made to proceed with an intent to terminate letter.[83]  On March 15, 2017, that letter was hand-delivered to Stella during a meeting with Hammon and Whelan.[84]  It stated the DOE intended to terminate him "for misconduct in office and willful neglect of duty," specifically, "the DOE's investigation revealed that you violated the DOE's External Communication policy 8.11, Department of Correction (DOC) Public Information, Media and Community Relations policy 10.3, DOE Employment Philosophy, and the DOC Code of Conduct."[85]  It advised a pre-termination meeting would be held on March 24, 2017, during which Stella would have the opportunity to present any mitigating or extenuating circumstances and work history.[86]

---

[80] *Id.*, A70 (letter from Hammon to Stella (Feb. 20, 2017)) at A70; D.I. 18 ¶ 37.
[81] D.I. 70, A130 (Hammon Dep. Tr. (Sept. 27, 2018)) at A131-A132, 17-18, A133-A134, 29-30.
[82] *Id.*, A130 at A132, 18-19.
[83] *Id.*, A130 at A132, 18.
[84] *Id.*, A81 at A81.
[85] *Id.*, A81 at A81.
[86] *Id.*, A81 at A84.

That meeting was held before Bunting, with Whelan, Hammon, Stella and his wife in attendance.[87]  Bunting reviewed pertinent documents prior to the meeting, including Stella's employment contract, applicable DOE and DOC policies, and training records.[88]  At some point before making her final decision, Bunting also reviewed Stella's Facebook post and the News Journal article.[89]

Stella and his wife read from prepared remarks during the meeting.[90]  In his defense, Stella stated he was under a great deal of stress on the day of the riot.[91]  He also offered that, due to his rotation among correctional facilities, he was not able to participate in "drills" or attend all monthly department staff meetings at JTVCC where departmental policies, including press policies, were reinforced.[92]  He also suggested that DOC officials who released him and the other employees following the hostage crisis should have "simply remind[ed] us about not communicating with the press, similar to how a judge always instructs a jury just before they would be dismissed for the day."[93]  Stella asserted he did not believe he disclosed anything "newsworthy" when he spoke with Parra because anyone monitoring police and fire band transmissions "knew more about what was going on than I did."[94]  He also believed that, in light of comments by his trainers and inmates, and a March 19, 2017 News Journal article reporting a "gross lack of security" at Delaware's Level 5 facilities, his "comments could not have

---

[87] *Id.*, A100 at A115, 141-42; *id.*, A81 at A84.
[88] *Id.*, A120 (Bunting Dep. Tr. (Sept. 20, 2018)) at A121; *id.*, A130 at A132, 19.
[89] *Id.*, A120 at A123, 26.
[90] *Id.*, A120 at A121, 20.
[91] *Id.*, A85 (Stella's Remarks (Mar. 24, 2017)) at A85.
[92] *Id.*, A85 at A86.
[93] *Id.*, A85 at A86.
[94] *Id.*, A85 at A86-A87.

made anyone less safe than was already the case prior to the siege."[95]

Following the pre-termination meeting, Bunting reviewed the documentation she had, consulted with Hammon about Stella's work history and applicable policies, consulted with legal counsel, and made the decision to terminate Stella.[96] Bunting documented her reasons for the decision in an April 4, 2017 letter, which was hand-delivered to Stella on that date.[97]

## III.   LEGAL STANDARD

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate if materials on the record, such as depositions, documents, electronically stored information, admissions, interrogatory answers, affidavits and other like evidence show that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.[98] The court must treat direct and circumstantial evidence alike.[99] In deciding a motion for summary judgment, the court's role is not to weigh the evidence or to determine the truth of the matters asserted, but to determine whether there is a genuine issue of fact for trial.[100] In so doing, the court must view all facts and draw all reasonable inferences in favor of the non-movant, take as true all allegations of the non-movant that conflict with those of the movant, and resolve all doubts against the movant.[101] The movant bears the burden of establishing the lack of a genuinely

---

[95] *Id.*, A85 at A87-A88.
[96] *Id.*, A121 at A122-A123, 23-27; *id.*, A130 at A132, 19, A135, 40-41.
[97] *Id.*, A90 (letter from Bunting to Stella (Apr. 4, 2017) ("termination letter")).
[98] Fed. R. Civ. P. 56 (a) and (c).
[99] *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94 (2003).
[100] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[101] *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985).

disputed material fact by demonstrating "that there is an absence of evidence to support the nonmoving party's case."[102] "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[103] "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."[104]

## IV.  DISCUSSION

### A.  Count I (Retaliation in Violation of First Amendment)

The court analyzes a public employee's claim of retaliation for engaging in protected activity under a three-step process.  First, a plaintiff must show the activity in question was protected.[105]  Protected speech addresses a matter of public concern and its value must not outweigh the interests of the state in operating efficiently.[106]  The second and third steps require a showing that the protected activity was a substantial or motivating factor in the alleged retaliatory action, and a determination of whether defendant would have taken the same action in the absence of the protected conduct.[107]  The first step is a question of law, the second and third steps generally involve questions of fact.[108]  Defendants' motion is based on the first step.

---

[102] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[103] *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).

[104] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted).

[105] *Watters v. City of Phila.*, 55 F.3d 868, 892 (3d Cir. 1995) (citations omitted).

[106] *Id.* (citations omitted).

[107] *Id.* (citations omitted).

[108] *Bailor v. Taylor*, 170 F. Supp. 2d 466, 469-70 (D. Del. 2001) (citation omitted).

Defendants contend they are entitled to summary judgment on Count I because: (1) Stella does not believe his termination was caused by the exercise of his constitutional rights; (2) he has not engaged in speech on a matter of public concern; and (3) the value of his speech does not outweigh the interests of the state in operating efficiently.[109] The Individual Defendants additionally contend they are entitled to qualified immunity.[110]

### 1.    Stella's Belief as to the Reason for His Termination

Defendants contend Stella fails to allege a First Amendment violation because he does not believe he was terminated for exercising his First Amendment rights.[111] Stella testified he believed his termination had nothing to do with the News Journal article or his Facebook post; it resulted from a breakfast conversation with DOC Commissioner Coupe during which he made a suggestion Coupe liked who then "took it upon himself to run with it," to the displeasure of Warden.[112] Defendants submit that testimony directly contradicts the FAC's allegation that he was terminated "in retaliation for Plaintiff's First Amendment protected speech on matters of public concern."[113]

Stella's subjective belief as to the reason for his termination is not determinative. The allegation in the FAC is consistent with the defendants' repeated statements that Stella was terminated for his commentary in the News Journal article and his Facebook

---

[109] D.I. 69 at 1-2; D.I. 68 at 1-2.
[110] D.I. 68 at 1.
[111] D.I. 69 at 4.  Because defendants' opening briefs are substantially identical with respect to Count I, citation is to the DOE's brief, except as to qualified immunity.
[112] D.I. 70, A100 at A111, 118-19.
[113] D.I. 69 at 4 (quoting D.I. 70, A18 at ¶ 67).

post.[114]  Stella's testimony of his perceived reason for termination is not grounds for

summary judgment.[115]

### 2.  Matter of Public Concern

Next, defendants argue Stella fails to state a First Amendment claim because he

has not engaged in protected speech.[116]  An employee's speech is protected by the

First Amendment if it touches upon "a matter of public concern."[117]  "Although the

boundaries of the public concern test are not well defined,"[118] it may be met where the

speech can be "fairly considered as relating to any matter of political, social, or other

concern to the community."[119]  Speech may also be protected when it "is a subject of

legitimate news interest; that is, a subject of general interest and of value and concern

to the public at the time of publication."[120]  Examples include speech seeking to inform

the public of government officials failing to discharging their responsibilities, or attempts

"to bring to light actual or potential wrongdoing or breach of public trust."[121]  "Whether an

employee's speech addresses a matter of public concern must be determined by the

content, form, and context of a given statement, as revealed by the whole record."[122]

Defendants maintain "[s]peech *typically* protected by the First Amendment

---

[114] *See, e.g.*, D.I. 70, A81; *id*, A90; D.I. 73, A87 (Bunting Dep. Tr. (Sept. 20, 2018)) at A096, 41; *id.*, A107 (Whelan Dep. Tr. (Sept. 25, 2018)) at A108-A109, 35-36.

[115] Defendants did not respond to Stella's argument on this point.

[116] D.I. 69 at 4.

[117] *Connick v. Myers*, 461 U.S. 138, 146 (1983).

[118] *City of San Diego v. Roe*, 543 U.S. 77, 83 (2004) (per curiam).

[119] *Connick*, 461 U.S. at 146.

[120] *San Diego*, 543 U.S. at 83-84.

[121] *Connick*, 461 U.S. at 148.

[122] *Id.* at 147-48 (footnote omitted).

involves employees who criticize their employers' policies or practices."[123]  They argue neither the News Journal article nor the Facebook post contain critical speech or otherwise address a matter of public concern.[124]

Defendants contend Stella's statements in the News Journal article did not reflect an attempt to "bring to light any wrongdoing" on behalf of government officials; he was merely relaying what he observed while on lock down at the prison.[125]  They argue interest in the events of February 1, 2017 by the media and general public does not transform Stella's comments into a matter of "public concern."[126]  They also maintain Stella's Facebook post is not protected speech because there was no criticism of public officials, rather it was completely positive, praising both DOC and DOE personnel.[127]

Stella argues that, contrary to defendants' suggestion, there is no requirement that an employee's speech criticize or point to some wrong-doing to address a matter of public concern.[128]  He maintains his comments and posting were protected because

---

[123] D.I. 69 at 5 (emphasis added) (citing *Watters*, 55 F.3d at 893-94 (citing U.S. Supreme Court and Third Circuit cases where critical speech found to be protected)). The Third Circuit also distinguished cases from other circuits relied upon by the defendants that found speech *not* protected.  In one case, the speech's topic was not a matter of interest to the community and did not alert the public to wrongdoing or credibly touch upon the adequacy of patient care.  In the other case, the context and form of the speech indicated it concerned a purely personal disagreement over operations and was not trying to expose any wrongdoing or inform the public of any problems within the college.  *Watters*, 55 F.3d at 893 n.4 (citing *Gomez v. Texas Dep't of Mental Health & Mental Retardation*, 794 F.2d 1018 (5th Cir. 1986); *Phares v. Gustafsson*, 856 F.2d 1003 (7th Cir. 1988)).

[124] D.I. 69 at 5.

[125] *Id.*

[126] *Id.* at 5-6 (citing *Lancaster v. Indep. Sch. Dist. No. 5*, 149 F.3d 1228, 1233 (10th Cir. 1998); *Koch v. City of Hutchison*, 847 F.2d 1436, 1445 (10 Cir. 1988); *Arndt v. Koby*, 309 F.3d 1247, 1255 (10th Cir. 2002)).

[127] *Id.* at 6 (citing D.I. 70, A66 at A66-A67).

[128] D.I. 71 at 13.

they related to matters of "political, social, or other concern to the community," and were "a subject of legitimate news interests."[129]

Stella argues the cases cited by defendants where critical speech by employees was protected are distinguishable from the facts of this case. He directs the court to *Bailor v. Taylor*[130] where this court held a former DOC internal affairs officer's speech concerning a prison riot was entitled to First Amendment protection.[131] Stella acknowledges the News Journal article "reported *only [his] observations*," but insists those observations addressed a matter of public concern because they were the "subject of legitimate news interests."[132] He contends that like the plaintiff in *Watters*, whose speech was found to be protected, his observations were "solicited by a newspaper reporter presumably because the problems it alleged about Police Department administration touched upon issues of 'political, social, or other' concern to the community."[133] He also states the News Journal article "describes the *personal experience* of someone who was a victim of the prison riots on February 1, 2017, which was of concern to the general public."[134] Stella likewise maintains his Facebook post touches on a matter of public concern despite the absence of DOC or DOE criticism.[135]

---

[129] *Id.* at 13-14 (quoting *Connick*, 461 U.S. at 146; *San Diego*, 543 U.S. at 83-84).
[130] 170 F. Supp. 2d 466 (D. Del. 2001).
[131] D.I. 71 at 14.
[132] *Id.* at 14-15 (emphasis added) (quoting *San Diego*, 543 U.S. at 83).
[133] *Id.* at 15 (quoting *Watters*, 55 F.3d at 894).
[134] *Id.* (emphasis added) (citing D.I. 73, A087 at A090, 54; A103, 77). At deposition, Bunting was asked: "Q. And you would agree that the riot coverage was of concern to the general public that day? A. The general public would have been interested in it, yes." D.I. 73, A087 at A103, 77. Bunting's statement is of no import to the court's determination of whether Stella's speech was legally a matter of public concern for First Amendment purposes.
[135] D.I. 71 at 15.

He nevertheless also asserts his post was an attempt to bring to light what he saw as issues within the DOC.[136]

The court agrees there is no bright-line rule that speech must include criticism to be protected, but recognizes that "many courts have particularly focused on the extent to which the content of the employee speech was calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of governmental officials in the conduct of their official duties."[137]

The court examines the content, form, and context of Stella's speech to determine if it touches on a matter of public concern. After review of the record as a whole, the court concludes the content of Stella's speech was purely personal.

Stella maintains the News Journal article "was based upon his experience as a hostage during the riot crisis and the *conditions* inside JTVCC," and that his Facebook post attempted "to bring to light what he saw as *issues* within the [DOC]."[138] The FAC only uses the word "condition" four times.[139] Paragraphs 53 and 90 refer to "unsafe" and "increasingly dangerous" "conditions" inside JTVCC as allegedly revealed in a 2005 Executive Task Force Report investigation into the cause of a security breakdown.[140] Those allegations and supporting facts were added when the original complaint was amended to include a State-Created Danger claim as Count IV.[141] The court dismissed

---

[136] *Id.*
[137] *Lancaster v. Indep. Sch. Dist. No. 5*, 149 F.3d 1228, 1234 (10th Cir. 1998) (citing *Koch v. City of Hutchinson*, 847 F.2d 1436, 1445 (10th Cir. 1988) (en banc)).
[138] D.I. 71 at 14-15 (emphasis added).
[139] D.I. 18 ¶¶ 53, 64, 65, 90. The FAC never uses the word "issue(s)" with reference to any conditions, policies, actions, activities, or related topics.
[140] *See* D.I. 18 ¶¶ 49-58, 87-95.
[141] *Compare* D.I. 1 *with* D.I. 18.

that count on July 24, 2018;[142] no reference to those conditions was made in the News Journal article or Facebook post.[143]  Paragraphs 64 and 65 recite:

> 64. Plaintiff's post to Facebook were made in the context as a private citizen on a matter of public concern which consisted of the conditions inside James T. Vaughn Corrections Center both on and before the incident on February 1, 2017.

> 65. As explained more fully above, Defendants terminated Plaintiff from his position as culinary instructor for speaking out about the conditions inside JTVCC.[144]

Paragraph 64 is a largely factually inaccurate statement asserting a legally unsupported conclusion.  The Facebook post made no comment about any conditions inside JTVCC *before* the February 1 incident and, other than relaying his observations *on* that date, provided no information about any "conditions" or "issues," to be "brought to light."  Paragraph 65 is an unsupported assertion.  Nothing is explained, fully or otherwise, that provides support for the allegation that Stella was terminated "for speaking out about the conditions inside JTVCC."[145]

Stella also suggests the News Journal's interest in his experiences demonstrates he was speaking on a matter of public concern.  The court disagrees.

The court first notes Stella asserted his comments contained only information

---

[142] D.I. 36.

[143] Stella read from prepared remarks at the March 24, 2017 pre-termination meeting referencing unsafe conditions at DOC facilities.  Those remarks were in response to the pre-termination letter's statement that comments in his Facebook post raised safety concerns.  D.I. 70, A85 at A87.  No similar comments were reported in the News Journal article or included in his Facebook post.

[144] D.I. 18 at ¶¶ 64-65.

[145] Paragraph 65 was part of the original complaint and, therefore, could not have been referring to the allegations related to the Task Force investigation added in the FAC.

already in the public domain, and that when he made them, "[he] didn't think for a minute that anything [he] said was newsworthy."[146]  Media publicity does not establish the covered speech is a matter is of public concern for First Amendment purposes,[147] however, the Third Circuit has stated where "local news media's assessment that the communication is newsworthy, 'entirely different considerations . . . come into play.'"[148] Media interest, therefore, is but one consideration taken into account in making a public concern determination.  In *Roseman*, the Third Circuit made the threshold determination that the employee's speech did not implicate a matter of public concern and then made the statement about newsworthiness in *dicta*.[149]  The *Monsanto* court concluded letters to the tax commissioner *criticizing* management of the tax division concerned matters of public import, a conclusion "*supported by* the fact that the issues raised in the letters were deemed important enough to be the subject of at least two radio broadcasts."[150]

Stella provides no compelling support for the proposition that his speech was a

---

[146] D.I. 70, A85 at A87.

[147] *Koch*, 847 F.2d at 1448 (citing *Egger v. Phillips*, 710 F.2d 292, 316-17 (7th Cir. 1983), *cert. denied,* 464 U.S. 918 (1983) ("In assessing whether the speech touches upon a matter of public concern, it is important not to equate the public's curiosity about a matter with a matter having societal ramifications. . . .  We do not believe . . . that the scope of an employee's freedom of speech can turn on his ability to convince a newspaper to print a story about his plight."); *Connick*, 461 U.S. at 160 n.2 (Brennan, J. dissenting) (majority opinion found Myers' questionnaire, with one exception, did not touch matters of public concern despite "extensive local press coverage")).

[148] *Monsanto v. Quinn*, 674 F.2d 990, 997 (3d Cir. 1982) (quoting *Roseman v. Indiana University*, 520 F.2d 1364, 1368 n.11 (1982)).

[149] *Roseman*, 520 F.2d at n.11 ("*[I]f* [the employee's] communications . . . had been on issues of public interest, or *if* she had convinced news media that her grievance . . . was newsworthy, entirely different considerations would come into play.") (emphasis added).

[150] *Monsanto*, 674 F.2d at 997 (emphasis added).

matter of public concern based on its newsworthiness.  The sole case he affirmatively relies on, *Bailor*, is only analogous to the extent that a state employee's speech related to a prison riot at a DOC facility.  The *Bailor* plaintiff filed a report containing allegations that certain correctional officers used excessive force against inmates during a riot.[151]  The parties agreed the plaintiff's speech was a matter of public concern and the court only addressed the balancing step of the First Amendment inquiry.[152]  Here, Stella's speech did not bring to light any alleged improprieties by government employees during the February 1 riot; it merely recounted his experiences.

The court also rejects Stella's comparison of his speech to the *Watters* plaintiff who was solicited by a newspaper reporter "presumably because . . . [his observations] touched upon issues of 'political, social, or other' concern to the community."[153]  There, a reporter approached the plaintiff with questions about the Employee Assistance Program ("EAP") for the Philadelphia Police Department and published an article quoting his comments criticizing certain aspects of the EAP.[154]  The plaintiff was terminated days later.[155]  The court stated the plaintiff spoke to the reporter "about the grave problems he perceived in operating the EAP without a written policy statement," the content of which appeared on its face "to address a matter of significant public concern."[156]  Additionally, there was "ample evidence in the record that the existence of

---

[151] *Bailor*, 170 F. Supp. 2d at 468.
[152] *Id.* at 470.
[153] D.I. 71 at 15 (quoting *Watters*, 55 F.3d at 894).
[154] *Watters*, 55 F.3d at 894
[155] *Id.*
[156] *Id.*

an effective EAP had been a matter of public interest for some time."[157]  The court found

the content of the plaintiff's speech was "precisely the kind of issue that a citizen of

Philadelphia is likely to find of the utmost importance."[158]  The statements Stella shared

with the News Journal reporter are not comparable.  Stella acknowledges the article

reported nothing more than his experiences.[159]  No criticism was made regarding the

actions of any government employee, facility procedures, treatment of Stella and other

staff during the lock down, or otherwise touching on a matter of public concern.

Media interest in Stella's experiences does not change that conclusion.  Public

interest in a topic does not necessarily equate with a matter of public concern for First

Amendment purposes.[160]

> Speech by a public employee "as a citizen upon matters of public concern"
> is distinguished from speech by "an employee upon matters of only
> personal interest" for which, "absent the most unusual circumstances, a
> federal court is not the appropriate forum in which to review the wisdom of
> a personnel decision taken by a public agency allegedly in reaction to the
> employee's behavior."[161]

*Arndt v. Koby*,[162] is illustrative of speech concerning a widely-publicized incident

with substantial public interest being determined as not touching on a matter of public

concern.  The *Arndt* plaintiff was a police detective involved in the murder investigation

of JonBenet Ramsey.[163]  The plaintiff and other officers were widely criticized in media

---

[157] *Id.*

[158] *Id.* at 893.

[159] D.I. 71 at 14.

[160] *See, e.g.*, *Egger v. Phillips*, 710 F.2d 292, 317 (7th Cir. 1983) ("People may be interested in any number of aspects of the lives of public officials and employees, but that does not mean that such matters have societal ramifications.").

[161] *Watters*, 55 F.3d at 892 (quoting *Connick*, 461 U.S. at 147).

[162] 309 F.3d 1247 (10th Cir. 2002).

[163] *Id.* at 1249.

reports generally alleging mistakes and mishandling of the investigation.[164]  The police

chief imposed a gag order prohibiting anyone in the department from speaking to the

media about the investigation.[165]  The police chief refused to lift the gag order despite

the plaintiff's requests to be permitted to address the allegedly inaccurate criticisms she

claimed harmed her reputation, or that the department do so.[166]  She then filed suit

asserting a First Amendment violation of her right to comment on a matter of public

concern.[167]  The district court concluded the plaintiff's proposed speech was not on a

matter of public concern and granted defendants' motion for judgment as a matter of

law.[168]  The Tenth Circuit affirmed that judgment, finding the content of the plaintiff's

proposed speech addressed only purely personal concerns related to repairing her

personal reputation.[169]  The court also found the form and context of the plaintiff's

proposed speech, a public response to media coverage of a sensational murder

investigation, did not transform her personal desire to restore her reputation into a

matter of public concern.[170]  Intense media coverage and public interest in the

investigation did not overcome the fact that the content of her speech overwhelmingly

supported the conclusion that her speech was purely personal.[171]

---

[164] *Id.*

[165] *Id.*

[166] *Id.* at 1249-50.

[167] *Id.* at 1250.

[168] *Id.*

[169] *Id.* at 1253-54, 1255.

[170] *Id.* at 1354.

[171] *Id.*; *cf. Rode v. Dellarciprete*, 845 F.2d 1195, 1201-02 (3d Cir.1988) (holding employee's interview sought by a news reporter that expressed personal concerns nevertheless touched on a matter of public concern where she claimed she was the victim of racial animus within a police department).

Here, the court also finds interest by the media and general public in the events of February 1, 2017 at JTVCC does not transform Stella's experiences reported in the News Journal into a matter of public concern.

Next, the court finds Stella's Facebook post does not bring to light any actual or potential wrongdoing or breach of public trust; it presents purely personal content and was entirely positive with respect to DOC and DOE personnel.[172]  Stella testified his only reason for writing and posting his thoughts to Facebook was a mechanism to cope with the stress from the event.[173]  As discussed above, there were no matters of public concern brought to light in that posting.

The content of Stella's speech in both the News Journal article and his Facebook post concern his experience during and after being locked down at JTVCC on February 1, 2017.  Based on the record as a whole, the court determines that content supports the conclusion that Stella's speech relates to matters of personal, not public, concern.

The fact that he felt the need to respond to the News Journal reporter and post his thoughts on Facebook, while shaken from his experience on the drive home or due to the need to cope with the resulting stress later that night, does not transform his speech into a matter of public concern.  Therefore, the context and form of his speech do not lead the court to the find that his speech was on a matter of public concern for First Amendment purposes, and do not overcome the determination that its content

---

[172] *See, supra,* Section II at 9-10; D.I. 70, A66 at A66-A67.  His inflammatory comments concerning certain inmates expressed his personal views and did not disclose information that implied criticism of the DOE or DOC.
[173] D.I. 70, A100 at A107, 94-95; A109, 106.

reflected personal, rather than public, concerns.[174]

Based on this conclusion, it is not necessary to proceed to a balancing analysis: "in order to merit Pickering balancing, a public employee's speech must touch on a matter of 'public concern.'"[175]

Defendants' motion for summary judgment on Count I is granted.

### 3. Qualified Immunity

The Individual Defendants separately argue that, as governmental employees, they are entitled to qualified immunity from Stella's First Amendment claim.[176]  Qualified immunity "'shield[s] [government actors] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[177]  "[W]hether [a government official] made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury."[178]  "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'"[179]

---

[174] *See Connick*, 461 U.S. at 147 (holding that speech "as an employee upon matters only of personal interest" is not protected).

[175] *San Diego*, 543 U.S. 82–83 (citing *Connick*, 461 U.S., at 143); *Rankin v. McPherson*, 483 U.S. 378, 384 (1987) ("The threshold question in applying [the *Pickering*] balancing test is whether [the employee's] speech may be 'fairly characterized as constituting speech on a matter of public concern.'") (quoting *Connick*, 461 U.S. at 146).

[176] D.I. 68 at 12.

[177] *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996) (alterations in original) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[178] *Curley v. Klem*, 499 F.3d 199, 221 (3d Cir. 2007).

[179] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (omission in original) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

The qualified immunity analysis involves two inquiries. A court must determine whether the facts alleged show a violation of a constitutional right, and whether the right at issue was "clearly established" at the time of the alleged misconduct.[180] The court may address these inquiries in either order and "may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all."[181]

"'To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"[182] "'When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law.'"[183] Although a case directly on point is not required, "'existing precedent must have placed the statutory or constitutional question beyond debate'";[184] "'a *robust consensus* of cases of persuasive authority in the Courts of Appeals'" could be sufficient to clearly establish a constitutional right.[185]

---

[180] *Pearson*, 555 U.S. at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

[181] *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citing *Pearson*, 555 U.S. at 236).

[182] *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Reichle*, 132 S. Ct. at 2093); *see also Holman v. Walls*, CIV.A. No. 86-1-JRR, 1989 WL 66636, at *9 (D. Del. June 13, 1989) (stating the "focus" for purposes of the court's inquiry of the individual defendants' entitlement to qualified immunity is whether their actions were objectively reasonable "'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation'") (quoting *Graham v. Connor*, 109 S. Ct. 1865, 1867 (1989)).

[183] *Barkes*, 135 S. Ct. at 2044 (alteration in original) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011)).

[184] *Id.* (quoting *al-Kidd*, 563 U.S. at 2083).

[185] *Id.* (quoting *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1779 (2015)).

### a.  violation of constitutional rights

The Individual Defendants reiterate their position that Stella's testimony that he believed his termination was not due to his comments reported in the News Journal or published in his Facebook post is fatal to his First Amendment claim.[186]  As discussed previously, Stella's testimony as to his perceived reason for termination is not determinative of this issue.  The court has also found, above, that the speech for which Stella was terminated is not entitled to First Amendment protection because it did not address a matter of public concern.

### b.  clearly established law

The key to analyzing whether clearly established law has been violated is to articulate the right in question and then determine whether the facts show the defendant had violated that right.[187]  The Individual Defendants frame the issue as whether enforcement of an agency's communication policy, based on statements made in the middle of a prison riot, violates an employee's First Amendment rights.[188]  They maintain no case law in the Third Circuit, and certainly no "consensus of cases," suggests clearly established law implicates such circumstances.[189]  Stella offers no alternative.  Instead,

---

[186] D.I. 68 at 12.

[187] *See, e.g.*, *Anderson v. Creighton*, 483 U.S. 635, 640-41 (1987) (The Supreme Court found it erroneous to generally recognize the right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances was clearly established, but refuse to consider whether the circumstances with which appellant was confronted did not constitute probable cause and exigent circumstances.  "It simply does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment that [petitioner's] search was objectively legally unreasonable.").

[188] D.I. 68 at 13.

[189] *Id.* at 13-14.

he emphasizes there is no requirement that prior case law has held the particular action in question unlawful, and that "officials can still be on notice that their conduct violates established law even in novel factual circumstances."[190]  The flaw in Stella's argument is that it merely states general legal principles for considering the issue.  He provides no reference to any case that could tie the actions of the Individual Defendants to the violation of a clearly established First Amendment right, thus failing to show that "'existing precedent . . . placed the statutory or constitutional question beyond debate.'"[191]  Lacking any basis to support Stella's argument, the court holds the Individual Defendants are qualifiedly immune from Stella's First Amendment claim.

**B.      Count II (Breach of Contract)**

The DOE contends it is entitled to summary judgment on Count II, Breach of Contract, because Stella's termination was based on actions constituting misconduct in office or wilful neglect of duty in violation of his employment contract which, after a formal hearing, were determined to be supported by the evidence and appropriate under the circumstances.[192]  Stella argues defendants have not provided examples of conduct supporting his termination, and that he was not provided a quasi-judicial hearing.[193]

Stella's employment contract provides for termination prior to its expiration "for any disciplinary action initiated by they [DOE]," or "for any violation of the [DOC's]

---

[190] D.I. 71 at 13 (quoting *Anderson*, 483 U.S. at 640).
[191] *Barkes*, 135 S. Ct. at 2044 (quoting *al-Kidd*, 563 U.S. at 2083).
[192] D.I. 69 at 2, 12.
[193] D.I. 72 at 3, 14.

policies and procedures . . . including . . . its 'Code of Conduct[.]'"[194]  Defendants

maintain the DOE initiated disciplinary action based on Stella's violation of numerous

DOE and DOC policies.[195]  Stella allegedly violated DOC Policy No. 10.3,

"Communication and Community Relations," by failing to refer media contact to the

CMR, and Section 1.5, "Unbecoming Staff Conduct," of the DOC's Code of Conduct

prohibiting "[a]ny conduct that would interfere with the staff member's ability or fitness to

effectively perform required duties."[196]

His contract also provides the DOE may terminate his employment "pursuant to

the provisions of 14 *Del. C.* §121(a)(5),"[197] which includes "misconduct in office" or

"wilful neglect of duty" as reasons for termination.[198]  Section 3.2.7, "Termination," of the

DOE Handbook provides:

> In the case of employees assigned to the Prison Education Program,
> failure to comply with any applicable rules and regulations of the
> Department of Correction, including the Department of Correction's Code
> of Conduct, shall constitute misconduct and shall be grounds for
> termination.[199]

Defendants assert Stella's actions constituted "misconduct" sufficient for termination,

and also willful neglect of duty because he intended to commit the actions alleged to

violate the relevant policies and procedures.[200]

Stella's March 15, 2017 pre-termination letter stated the DOE's intent to

---

[194] D.I. 70, A41 at A43 § 5(C)-(D).
[195] D.I. 69 at 11; D.I. 73, A105.
[196] D.I. 69 at 11; D.I. 70, A8 at A14 § 1.5(j).
[197] D.I. 70, A41 at A43 § 5(B).
[198] 14 *Del. C.* § 121(a)(5).
[199] D.I. 70, A25 at A33 § 3.2.7.
[200] D.I. 69 at 12.

terminate his employment:

> for misconduct in office and willful neglect of duty. *See* 14 *Del. C.*
> § 121(a)(5). Specifically, the DOE's investigation revealed that you
> violated the DOE's External Communication policy 8.11, Department of
> Correction (DOC) Public Information, Media and Community Relations
> policy 10.3, DOE Employment Philosophy, and the DOC Code of
> Conduct.[201]

The pre-termination letter referenced the February 1, 2017 News Journal article, published during the hostage situation, that "included descriptive and confidential information that should not have been released without going through the proper communication channels at DOE and DOC."[202] Those actions were deemed to be clear violations of DOE Policy 8.11 and DOC Policy 10.3.[203] It noted Stella had been reminded several times by Warden, King, and others "about the importance of working through your chain of command."[204]

That letter also referenced "very troubling" comments in Stella's Facebook post, which "caused serious concern for your safety and the safety of others."[205] He was told his "actions are in direct conflict with the DOE's Employment Philosophy and the DOC Conduct [sic] of Conduct and have compromised your ability and fitness to effectively perform the essential functions of your position."[206]

It reproduced the statement of DOE Employment Philosophy, located in the Employee Handbook, that:

---

[201] D.I. 70, A81 at A81.
[202] *Id.*, A81 at A81.
[203] *Id.*, A81 at A82.
[204] *Id.*, A81 at A82.
[205] *Id.*, A81 at A82-A83.
[206] *Id.*, A81 at A83.

> Each employee has a responsibility to positively represent the Department of Education both on and off duty. Any unprofessional behavior or conduct that can adversely affect the public image of the Department and/or compromise the ability of employees to execute the duties of the Department are inconsistent with the Department's employment philosophy and may result in disciplinary action. Employees must not participate in activities which are incompatible with employment with the Department.[207]

The Employee Handbook was reviewed with Stella on February 1, 2016.[208]

The pre-termination letter also specified sections 1.4 and 1.5(i), (j), and (p) of the DOC's Code of Conduct as violated by his actions.[209] Stella's CEIT training "included a review of the DOC Code of Conduct and DOC policies/procedures for public communication."[210] During that time period, he also:

> received training on DOE specific policies/procedures from the Director and Education Associate for Adult and Prison Education. This training included a review of the DOE Employee Handbook, the DOE/DOC Memorandum of Understanding, which discusses the proper chain of command, and the use of email and DOE/DOC communications.[211]

Stella's April 4, 2017 termination letter relayed Bunting's decision to terminate his employment.[212] It referred to the pre-termination letter and reiterated "misconduct in office and willful neglect of duty" as the basis for his dismissal.[213] It referenced the March 24, 2017 pre-termination meeting attended by Bunting, Hammon, Whelan, and Stella and his wife.[214] Stella and his wife read from prepared remarks which were

---

[207] *Id.*, A81 at A83.
[208] *Id.*, A81 at A83.
[209] *Id.*, A81 at A83.
[210] *Id.*, A81 at A83.
[211] *Id.*, A81 at A83.
[212] *Id.*, A90.
[213] *Id.*, A90 at A90.
[214] *Id.*, A90 at A90.

provided to Bunting at the end of the meeting.[215]

Bunting recognized that 14 *Del. C.* § 121(a)(5) requires she take into account any mitigating or extenuating circumstances, as well as Stella's work history with the DOE, in her deliberations.[216]  The letter noted the twelve-week DOC CEIT program Stella attended, and his separate training on DOE-specific policies and procedures from the Director and Education Associate for Adult and Prison Education.[217]  As a mitigating factor, she noted Stella's "passion for the culinary arts" and "support for the construction of the new culinary arts kitchen[.]"[218]  The termination letter also referenced the pre-termination letter's detail of the "specific policy violations that occurred as a result of your actions on February 1, 2017, and explained the impact of these violations."[219] Bunting stated she listened carefully to Stella's statement, but concluded he "d[id] not fully understand the seriousness of [his] conduct," or the potential safety risks and disruption of the education program of that conduct.[220]  She concluded the reasons for Stella's termination detailed in the pre-termination letter established misconduct in office and willful neglect of duty.[221]  She also found Stella's mitigating and extenuating circumstances were insufficient to avoid dismissal and upheld the termination decision.[222]

---

[215] *Id.*, A90 at A90.
[216] *Id.*, A90 at A90.
[217] *Id.*, A90 at A90.
[218] *Id.*, A90 at A90.
[219] *Id.*, A90 at A91.
[220] *Id.*, A90 at A91.
[221] *Id.*, A90 at A91.
[222] *Id.*, A90 at A91.  At deposition, Bunting affirmed she assessed and considered additional mitigating or extenuating circumstances, including that Stella's actions occurred while he was suffering post traumatic stress from being locked down for over

As provided by the DOE Employee Handbook and 14 *Del. C.* § 121(a)(5), Stella requested and received a formal hearing before a hearing officer appointed by the Director of the Office of Management and Budget ("OMB").[223]  Thomas J. Smith presided over a hearing on June 22, 2017, which was attended by Stella, his attorney Michele Allen, and Hammon.[224]  On August 31, 2017, Smith issued a decision that concluded Stella's "dismissal is supported by the record and appropriate to the circumstances," and denied Stella's complaint.[225]

The court begins by noting the parties disagree over whether Stella's formal hearing, and resultant decision to terminate, was a quasi-judicial hearing and the proper standard that should be applied to the court's review of that decision.  Many state agencies are governed by statutes that detail the process for hearings and appeals available to aggrieved employees.  For instance, the Public Employment Relations Board ("PERB") has the power to:

> hold hearings, subpoena witnesses, administer oaths and take the testimony or deposition of any person under oath, and in connection therewith, to issue subpoenas requiring the production and examination of any books or papers, including those of the State and/or a board of education relating to any matter pending before it, and to take such other action, including the granting of interim or other relief as may be necessary to discharge its powers and duties.[226]

"Any party adversely affected by a decision of the Board [in an unfair labor practice

---

five hours during which he heard hostage negotiations and officers' lives being threatened. D.I. 76 (Defendants' Reply Brief Appendix), C26 (Bunting Dep. Tr. (Sept. 20, 2018)) at C28-C30, 31-33.

[223] D.I. 70, A25 at A33; 14 *Del. C.* § 121(a)(5); *id.*, A92 (letter from Michele D. Allen to DOE (Apr. 18, 2017)).

[224] *Id.*, A95 (OMB Employment Hearing Decision (Aug. 31, 2017)) at A95.

[225] *Id.*, A95 at A99.

[226] 14 *Del. C.* § 4006(h)(2).

proceeding] may appeal that decision to" the Delaware Court of Chancery.[227]  The Merit

Employee Relations Board "(MERB") has similar powers.[228]  Stella contrasts those

powers with 14 *Del. C.* § 121(a)(5) which does not provide employees the same

rights.[229]  Stella asserts his inability to subpoena witnesses or compel document

production, or lack of opportunity for any preliminary conferences or hearings by which

he would have the ability to contest the evidence to be used against him demonstrates

his formal hearing was not a quasi-judicial hearing which protected his due process

rights.[230]  Aside from addressing Stella's subsidiary argument that his formal hearing

was not quasi-judicial because of bias,[231] defendants' reply brief is bereft of response to

Stella's argument that he did not have a quasi-judicial hearing.  The court need not

resolve that argument because it determines the record does not support summary

judgment for defendants on Count II.

Neither "misconduct in office" nor "willful neglect of duty" is defined by 14 *Del. C.*

§ 121(a)(5).  The Employee Handbook defines misconduct in office as "failure to comply

with any applicable rules and regulations of the [DOC], including the [DOC's] Code of

Conduct[.]"[232]  The Superior Court of Delaware defined "misconduct" as:

> "(a) transgression of some established and definite rule of action, a
> forbidden act, a dereliction from duty, unlawful behavior."  BLACK'S LAW
> DICTIONARY 1150 (4th ed. 1968).  The term "misconduct in office" means

---

[227] 19 *Del. C.* § 1309(a); 19 *Del. C.* § 1609(a); 14 *Del. C.* § 4009(a).
[228] *See* 29 *Del. C.* §§ 5906(a), 2944; MERB Rule 12.9.  Both the PERB and
MERB provide for appeal to state court by an aggrieved employee.  *See*  19 *Del. C.*
§ 1309(a); 19 *Del. C.* § 1609(a); 14 *Del. C.* § 4009(a); 29 *Del. C.* § 10142(a).
[229] D.I. 72 at 9-10.
[230] *Id.* at 10.
[231] D.I. 74 at 2 n.2.
[232] D.I. 70, A25 at A33 § 3.2.7.

"[a]ny unlawful behavior by a public officer in relation to the duties of his office, willful in character." *Id.*[233]

"'Misconduct in office' includes wantonness and violation of law, but not honest mistakes."[234]

"'Neglect of duty' has been defined as the indifferent or willful refusal to perform the responsibilities of [a person's employment.]"[235]  In the context of rules regulating real estate appraisers, the court concluded "willfully disregarding" required the appraiser to have "intended to commit the act or omission that, in turn, violated the rules," intent to violate the relevant provisions is not required.[236]

There is no dispute Stella committed the acts that were determined to violate DOE and DOC policies, i.e., speaking to the News Journal reporter and posting to Facebook.  Stella admitted he "made an error in judgment" due to stress, "accept[ed] full responsibilities for [his] actions on February 1, 2017," and expressed regret and

---

[233] *Sheck v. Board of Educ. of the Colonial Sch. Dist.*, C.A. No. 82A-MR-19, 1983 Del. Super. LEXIS 805, at *5 (Del. Super. Ct. Feb. 10, 1983); *see also Rousak v. Board of Educ. of the Cape Henlopen Sch. Dist.*, C.A. 87A-MY-1, 1987 Del. Super. LEXIS 1392, at *8 (Del. Super. Ct. Dec. 23, 1987) (Chandler, J.).  *Sheck* and *Rousak* each considered a different statute, 14 *Del. C.* § 1420, that provided for termination for "misconduct in office" but did not define that term.  The DOE does not dispute the Superior Court's definition in its reply brief.

[234] *Rousak*, C.A. No. 87A-MY-1, at *8 (quoting *Lavoie v. Bd. of Educ. the Capital Sch. Dist.*, 294 C.A. 1972, Quillen, J. (Jan. 8, 1973)).

[235] *Id.* (citing *Hall v. Bd. of Educ. of the Smyrna Ch. Dist.*, Del. Super., 193 C.A. 1976, Christie, J. (May 16, 1978) at 4); *see also Wilson v. Bd. of Educ. of Brandywine Sch. Dist.*, 3 A.3d 1099 (Table), No. 277, 2010, 2010 WL 3530018, at *2 (Del. Super. Ct. Sept. 13, 2010) ("This Court has defined neglect of duty to mean 'the failure to do something that is required to be done in connection with a person's employment'") (quoting *Mack v. Kent Cty. Vocational Tech. Sch. Dist.*, 1987 WL 11466, at *1 (Del. Super. Ct. May 20, 1987)).

[236] *Berchock v. Council on Real Estate Appraisers*, No. CIV.A. 00A-10-004-CG, 2001 WL 541026, at *6-7 (Del. Super. Ct. Apr. 26, 2001), *aff'd*, 787 A.2d 100 (Del. 2001).

apologized for those actions.[237]  Stella argues, however, there is a genuine issue of material fact as to whether he engaged in "misconduct in office" or "willful neglect of duty" sufficient to support his termination for cause.[238]

Stella maintains defendants have not met their burden to show his conduct in question, which occurred outside of his employment with the DOE and outside of the DOC, while acting as a private citizen, rose to the level of either misconduct in office, or willful neglect of duty.[239]  Contrary to defendants' assertion that Stella's violations of numerous DOE and DOC policies constituted "misconduct" sufficient for termination, he maintains they point to only one alleged policy violation, which was DOC Policy 10.3.[240] Stella also contends defendants' assertion that his actions constituted "willful neglect of duty" was based on the fact he admitted to making an error in judgment.[241]

Stella argues the Delaware Superior Court's *Rousak* decision supports denial of summary judgment on his breach of contract claim.[242]  There, as here, the facts were substantially uncontroverted.  A teacher approved a project in which students designed badges, some of which contained expletives or sexual references.[243]  She was subsequently terminated by the board of education for misconduct in office and neglect of duty and she appealed that decision to the superior court.[244]  The teacher's performance evaluations were positive and she had no record of disciplinary

---

[237] D.I. 70, A100 at A110a, 115-16; D.I. 70, A85 at A85, A88.
[238] D.I. 72 at 6.
[239] *Id.* at 3.
[240] *Id.*
[241] *Id.*
[242] *Id.* at 4.
[243] *Rousak*, 1987 Del. Super. LEXIS 1392, at *3.
[244] *Id.* at *1, *4-5.

violations.[245]  She also admitted she exercised poor judgment in approving the

project.[246]  The court's review of Delaware law on the subject found in "every case in

which a teacher termination based on [misconduct in office or neglect of duty] was

upheld by this Court, the offending conduct consisted of multiple violations of school

policies and procedures,"[247] and concluded "a single incident of the type and gravity

presented here does not constitute misconduct in office or neglect of duty as a matter of

law."[248]

Here, Stella's employment record is devoid of any negative performance reviews

and free from disciplinary sanction.  The policy violations for which he was terminated

consisted of two actions taken on one evening while he was off duty and away from

state facilities.  His record does not reveal multiple prior violations DOE and DOC

policies like the cases referenced in *Rousak*.  The DOE reminded him on more than one

occasion of the need to follow the chain of command and the need for supervisor

approval with regard to communications, but did not deem those incidents of a nature

requiring memorialization in his employment record, much less any level of formal

discipline.  Stella acknowledged his actions demonstrated poor judgment, for which he

apologized.[249]  He attempted to ameliorate the potential harm from his actions early the

next morning, February 2, 2017, by urgently contacting Parra to head off publication of

his letter to the editor containing his Facebook post (which appears to have not been

---

[245] *Id.* at *2.
[246] *Id.* at *7.
[247] *Id.* at *9-10 (listing cases).
[248] *Id.* at *11.
[249] D.I. 70, A100 at A110a, 115-16; *id.*, A85 at A85, A88.

published), and taking down his Facebook post.[250]  The court also notes Stella's pre-termination letter asserted the News Journal article included "confidential information,"[251] which Bunting testified was not the case.[252]  Although Stella's policy violations are of a different "type and gravity" than those discussed in *Rousak*, the court determines there is a genuine issue of material fact as to whether Stella's actions rise to the level of "misconduct in office" or "neglect of duty" sufficient to support his termination.

Defendants' motion for summary judgment on Count II is denied.

## C.    Count III (Breach of the Implied Covenant of Good Faith and Fair Dealing)

The DOE maintains it is immune from Stella's implied covenant claim under the State Tort Claims Act because the State does not carry insurance to cover such a claim.[253]  It also contends the FAC fails to state a claim under the "false and fictitious grounds" prong of an implied covenant claim because no records were falsified and Stella simply disagreed with the rationale for termination.[254]

### 1.    State Tort Claims Act

Stella alleges a violation of the covenant of good faith and fair dealing.  "Such a covenant is an implied part of every employment contract.  A claim for a breach of this

---

[250] *Id.*, A116 at 213, A117a; *id.*, A56 at A57; *id.*, A116 at A117, 210; *id.*, A116 at A117a, 213-14; *id.*, A137 at A143a, 54; *id.*, A125 at A126, 62-63.

[251] D.I. 70, A81 at A81.

[252] *Id.*, A087 at A099, 54 (Bunting testifying Stella's comments in the News Journal article concerned his personal experiences and did not reveal confidential information)).

[253] D.I. 69 at 14.

[254] *Id.* at 2.

41

covenant is one sounding in contract. While this claim is one in contract, it, nevertheless, implicates the State Tort Claims Act."[255] Pursuant to § 4001 of the act:

> except as required by the constitution or laws of the United States or Delaware, the State and its agents are protected by sovereign immunity in any civil suit or proceeding at law or in equity or before any administrative tribunal where the act (of the State) was done in good faith, without gross or wanton negligence, and arose out of and in connection with the performance of official discretionary duties.[256]

Under 18 *Del. C.* § 6511, the State is immune from such claims where no insurance coverage exists.[257] Debra Lawhead, Insurance Coverage Administrator of the State of Delaware, submitted a declaration indicating the State of Delaware and the DOE have not purchased any insurance to cover an implied covenant claim.[258]

Stella asks the court to find Lawhead's declaration inadmissible for violation of FED. R. CIV. P. 37[259] because she was not previously disclosed as having potentially discoverable information.[260]

Pursuant to Rule 26(a), defendants are required to provide Stella information concerning "each individual likely to have discoverable information–along with the

---

[255] *Tomei v. Sharp*, 902 A.2d 757, 769 (Del. Super. 2006) (citing *Merrill v. Crothall–American*, 606 A.2d 96, 101 (Del. 1992), 10 *Del. C.* §§ 4001–4005).

[256] *Doe v. Cates*, 499 A.2d 1175, 1180 (Del. 1985) (citing 10 *Del. C.* § 4001).

[257] *Cates*, 449 A.2d at 1181; *id.* ("Section 6511 waived immunity only as to risks covered by the State Insurance Program. . . . In keeping with the purpose of the State Tort Claims Act, this Court holds that § 4001 must be applied to limit the State's liability where it has, by some means independent of 10 *Del. C.* § 4001, waived immunity. We note that Judge Stapleton reached a similar conclusion in *Space Age Products, Inc. v. Gilliam*, D. Del., 488 F. Supp. 775 (1980). In the instant cases, the State has not independently waived sovereign immunity under 18 *Del. C.* § 6511 because there is no insurance coverage for the risks presented.").

[258] D.I. 70, A178 (Lawhead Decl.) at A178.

[259] D.I. 72 at 17-18.

[260] *Id.* at 17.

subjects of that information–that the disclosing party may use to support its claims or defenses."[261]  Rule 37(c)(1) provides that a party failing to comply with Rule 26(a) "is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."[262]  The court's determination of whether to exclude evidence is discretionary.[263]  "Although Rule 37 'is designed to provide a strong inducement for disclosure of Rule 26(a) material,' it still leaves the trial court with discretion to determine if a party provides substantial justification for their delay or if the delay is harmless."[264]

Stella argues defendants' failure to comply with Rule 26(a) was not harmless because they rely on Lawhead's declaration to show the State does not have coverage for any implied covenant claims.[265]  Because Lawhead was not named in defendants' initial rule 26 disclosures, or their two supplemental disclosures, Stella urges the court to find those declarations inadmissible.[266]

Defendants response is lacking.  They repeat their citation to *Cates*, add a citation to an unpublished order of the Delaware Supreme Court observing "the State has the unique knowledge about the coverage of its insurance programs,"[267] and refer the court to three Delaware Superior Court cases where judgment was granted to State

---

[261] FED. R. CIV. P. 26(a)(1)(A)(i).
[262] FED. R. CIV. P. 37(c)(1).
[263] *Quinn v. Consol. Freightways Corp. of Del.*, 283 F.2d 572, 576 (3d Cir. 2002).
[264] *Brooks v. Price*, 121 Fed. App'x 961, 965 (3d Cir. 2005) (quoting *Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 156 (3d Cir.1995)).
[265] D.I. 72 at 17-18.
[266] *Id.* at 18.
[267] *Clouser v. Doherty*, 175 A.3d 86 (Table), 2017 WL 3947404, at *7 (Del. Sept. 7, 2017).

defendants based on the production of an affidavit demonstrating lack of insurance.[268]

No attempt is made to provide substantial, or any, justification for their failure to comply

with Rule 26(a).  That failure is certainly not harmless as lack of insurance coverage

could be dispositive of this claim, an issue that should have been apparent to

defendants early in this litigation.  The only argument raised is that Stella does not

dispute such coverage exists, and that there is no reasonable dispute about the State's

coverage.[269]  Defendants' position improperly deprives Stella of any opportunity to

challenge Lawhead's affidavit.

> [W]hen the State claims that its insurance program does not cover
> potential claims, it must back up the defense with an affidavit from the
> Insurance Administrator confirming the absence of insurance coverage
> under the insurance program for the potential loss. Then, on notice and
> after converting the motion to dismiss into a summary judgment motion,
> the Superior Court can consider the affidavit and any challenge the
> plaintiff might make to its assertions [obtained via limited discovery under
> Superior Court Civil Rule 56(f)].[270]

The court declines to consider Lawhead's affidavit.

### 2.    False and Fictitious Grounds

In *E.I. DuPont de Nemours & Co. v. Pressman*,[271] the Delaware Supreme Court

listed four categories of actionable implied covenant of good faith and fair dealing

claims:

> (i) [W]here the termination violated public policy; (ii) where the employer
> misrepresented an important fact and the employee relied "thereon either
> to accept a new position or remain in a present one"; (iii) where the
> employer used its superior bargaining power to deprive an employee of

---

[268] D.I. 74 at 5-6 (citations omitted).
[269] *Id.* at 6 n.4.
[270] *Clouser*, 2017 WL 3947404, at *7 (footnote omitted).
[271] 679 A.2d 436 (Del. 1996)

clearly identifiable compensation related to the employee's past service; and (iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination.[272]

Stella claims his termination constituted a violation of the fourth category. The FAC alleges defendants breached the implied covenant of good faith and fair dealing "by falsifying reasons for terminating [Stella] from his position as a prison education teacher."[273] Stella maintains "[t]he Delaware Superior Court has held that an employee must show the employer intentionally *created false reasons* to terminate his employment *or* otherwise that the employer intentionally falsified [his] employment records" to support an implied covenant claim.[274] Stella concludes, therefore, that he "does not have to prove Defendants actually falsified the employment records relating to his termination. *He only has to show the employer intentionally created false reasons to terminate his employment.*"[275] Stella contends defendant's false reason for his termination was that his actions created a safety risk.[276]

The court disagrees with the implication Stella draws from the *Cosby* opinion as to what must be shown to support his claim. The specific part of the sentence reciting the intentional creation of "false reasons to terminate" cites the section of *Pressman* that stated the nature of "employment relationships counsels caution about creating causes of action based solely on personal motivations," but described evidence showing the

---

[272] *Lord v. Souder*, 748 A.2d 393, 400 (Del. 2000) (quoting *v. Pressman*, 679 at 442-44).

[273] D.I. 18 at ¶ 83.

[274] D.I. 72 at 15 (citing *Cosby v. Correct Care Sols., LLC*, K15C-06-019 JJC, 2016 WL 7103387, *4 (Del. Super. Ct. Dec. 6, 2016)) (emphasis added).

[275] *Id.* at 16 (emphasis added).

[276] *Id.* at 16-17.

employee's former supervisor "set out on a campaign to discredit [the employee] by *creating fictitious negative information* about [the employee's] work and hiding positive information."[277]  That campaign included misrepresentations creating the appearance that the employee did not complete tasks, editing a progress report to understate his accomplishments, and failing to pass along a progress report showing significant accomplishments.[278]  Thus, the falsification of the employee's record leading to termination was the issue, not an allegedly false reason for that termination.

Indeed, the *Cosby* court specified that "to maintain a breach of the implied covenant of good faith and fair dealing claim, [the employee] must demonstrate evidence that [the defendant] *manufactured* grounds for dismissal.  This requires a showing that the employer actually created false grounds for firing an employee."[279]  *Cosby* cited opinions by the Third Circuit and this court in support.[280]  The Third Circuit determined "[i]f the employer did not actually falsify or manipulate employment records, then it does not matter if the employer gave a *false rationale* for termination."[281]  Likewise, this court stated "employers are only culpable for the *manufacture* of grounds for dismissal, not for the statement of a false reason for dismissal."[282]  In *Williams*, this court reemphasized "*Pressman* only held culpable the *manufacture* of grounds for

---

[277] *Pressman*, 679 A.2d at 444 (Del. 1996).
[278] *Id.* at 438-39.
[279] *Cosby*, 2016 WL 7103387, at *4 (footnote omitted) (emphasis in original).
[280] *Id.* at *4 n.32.
[281] *EEOC v. Avecia*, 151 F. App'x 162, 165 (3d Cir. 2005) (emphasis added).
[282] *Reed v. Agilent Techs., Inc.*, 174 F. Supp. 2d 176, 191 (D. Del. 2001) (emphasis in original) (citing *Williams v. Caruso*, 966 F. Supp. 287, 291 (D. Del. 1997) ("Nothing in *Pressman* suggests [that] an employer who gives an employee a false reason for termination is subject to liability under the implied covenant of good faith and fair dealing.") (alteration in original)).

dismissal, not the *statement* of a false reason for dismissal."[283]  In yet another case

mentioned in Stella's brief,[284] the Delaware Supreme Court stated a plaintiff has "the

burden to prove . . . the falsification *of her records*" to support an allegation that those

records were "falsified or manipulated . . . to create a fictitious ground" for termination.[285]

Thus, precedent does not support Stella's position that an allegedly false reason

for dismissal is sufficient to support a claim for breach of the implied covenant of good

faith and fair dealing.[286]

The Delaware Superior Court's decision in *Layfield v. Beebe Medical Center,*

*Inc.*[287] is factually similar to this case.  The *Layfield* plaintiff, a nurse, made

---

[283] *Williams*, 966 F. Supp. at 291 (emphasis in original); *see also Bomberger v. Benchmark Builders, Inc.*, C.A. No. 16-1071-RGA, 2017 WL 1377595, at *3 (D. Del. Apr. 13, 2017) (dismissing breach of implied covenant of good faith and fair dealing claim where the plaintiff alleged the employer created a false reason for termination, and letters and e-mails falsely stated the employee voluntarily resigned; "creating a false reason for termination" or the "memorializing of its false reasons for termination in writing" is "insufficient to sustain a claim for breach of the implied covenant") (citing *Lord v. Souder*, 748 A.2d 393, 400 (Del. 2000); *Reed*, 174 F. Supp. 2d at 191).

[284] D.I. 72 at 16.

[285] *Rizzitiello v. McDonald's Corp.*, 868 A.2d 825, 831 (Del. 2005) (emphasis added) (citing *Pressman*, 679 A.2d at 440, 442-44).

[286] Stella's citation to a recent bench ruling on a motion to dismiss does not change the court's conclusion.  D.I. 72 at 15-16 (citing *Vasquez v. Fabrizio Hair Salon*, C. A. No. N16C-12-252 (Del. Super. Ct.); D.I. 73, A170 (Hr'g Tr. (Nov. 28, 2017)).  The *Vasquez* court noted the high standard to prevail on a motion to dismiss and indicated discomfort dismissing the complaint before discovery.  *Id.*, A170 at A172, 3, A189, 20. At issue was the plaintiff's termination for purported policy violation and excessive absenteeism which her attorney suggested discovery would reveal was based upon falsification and manipulation of the plaintiff's record.  *Id.*, A170 at A186, 17, A188, 19. There, the defense to the alleged implied covenant violation claim would be based on a falsely manufactured record to support termination, not a falsely manufactured reason for termination.  Here, discovery is complete and Stella merely argues defendants manufactured a false reason for his termination.  D.I. 72 at 16-17.

[287] C.A. No. 95C-12-007, 1997 Del. Super. LEXIS 472 (Del. Super. Ct. July 18, 1997).

documentation errors in violation of hospital policies and was terminated based on the

defendant's resulting loss of confidence in her nursing abilities.[288]  The plaintiff alleged

she was fired based on jealousy and resentment, and that the defendant manipulated

her record to justify it.[289]  The court granted summary judgment for the defendant where

the record showed the plaintiff admitted to several errors in violation of hospital policy,

and that the explanation she alleged as the real reason for her termination could not

show a violation of the implied covenant.[290]

Here, Stella does not argue the evidence his termination was based upon, i.e.,

screen shots of his Facebook page and statements attributed to him in the News

Journal article, was false or manufactured.  He simply argues the reason given for his

termination, that his actions created a safety risk, is false.[291]  Moreover, the pre-

termination and termination letters cannot be the basis for his implied covenant claim

because they merely memorialize defendants' reasons for his termination:  "misconduct

in office and willful neglect of duty."[292]  Those letters note safety concerns as a result of

Stella's actions,[293] but, even if those concerns were false, they are not a false

manipulation of his record upon which his termination was based.  Likewise, even

accepting Stella's testimony that the real reason he was fired was because Warden was

"pissed off" and "insecure" about Stella's breakfast meeting and friendship with

---

[288] *Id.* at *6-7.
[289] *Id.* at *13, *13 n.3.
[290] *Id.* at *13-14, *13 n.3.
[291] D.I. 72 at 16-17.
[292] D.I. 70, A81 at A81; *id.*, A90 at A90.
[293] *Id..* A81 at A83; *id.*, A90 at A91.

Coupe,[294] his claim fails. "Dislike, hatred or ill will, alone, cannot be the basis for a cause of action for termination of an at-will employment."[295]

Defendants' motion for summary judgment on Count III is granted for failure to show his termination was based on "false and fictitious grounds."

## V.    CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment (D.I. 67) is GRANTED in part and DENIED in part.


March 18, 2019                                   /s/ Mary Pat Thynge
                                                  Chief U.S. Magistrate Judge

---

[294] *Id.*, A100 at A110, 109-10; *id.*, A100 at A111, 118-19.
[295] *Pressman*, 679 A.2d at 444.